Robert William GORMAN, Defendant,
Appellant,

v.

UNITED STATES of America,
Appellee.

Edward Terrence ROCHE, Defendant,
Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 6805, 6806.

United States Court of Appeals
First Circuit.

June 29, 1967.

John P. Bourcier, Providence, R. I., by appointment of the Court for appellant Robert Gorman.

Robert A. Gentile, Providence, R. I., by appointment of the Court for Edward Roche.

Alton W. Wiley, Special Asst. U. S. Atty., with whom Frederick W. Faerber, Jr., U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

These are appeals from judgments of conviction, following jury trial, of robbery of the Warwick branch of the Rhode Island Hospital Trust Company, its deposits being insured by the Federal Deposit Insurance Corporation. 18 U.S.C. § 2113.[1] We affirm.

The robbery occurred on July 31, 1964. The defendants were identified as the robbers by eyewitnesses. The major issues before us stem from the events leading to the arrest of defendants and the seizure of evidence pursuant to several searches. Several other claims of error arise out of the trial and will be discussed later.

■ The first break in the case came in New York City over five weeks after the robbery. On the evening of September 8, 1964, New York narcotics agents followed a car bearing known addicts and a man unknown to them to an unfinished, dead end street, overgrown with grass and littered with debris. They observed an unknown man—defendant Gorman—emerge from and return to the car several times, after opening both the hood and the trunk. They approached as Gorman was in the act of injecting his left arm with a needle affixed to an eye dropper. One of the officers took the needle from him, placed him under arrest for violation of the narcotics laws, patted his pockets, and took his wallet, which contained various credit cards bearing the name James Conner, and an "Account

1. Defendants here are the same as those in United States v. Gorman, 355 F.2d 151 (2d Cir. 1965), cert. denied, 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966), which involved another bank robbery in Ridgefield, Connecticut. A single chain of circumstances led to their apprehension for both crimes, but the evidence in the record before us differs in several substantial details from that before the Second Circuit, principally in the absence here of any confession.

Identification Card" for the Conner & Noel Sales Company. Gorman identified himself as James Conner, of the firm of Conner & Noel. Asked why he was using the needle, Gorman replied that he was a user.[2]

An officer immediately searched the trunk of the car and found· an attache case containing a loaded .38 caliber revolver, some extra bullets, $26,660 in currency, some maps, a brown paper bag on which Warwick street names were written, a key to room 23 at the Courtesy Inn motel in New Jersey, and a street guide for Providence, Rhode Island.

Gorman was arrested at about 9:00 p.m. and brought immediately to a police station. He was not given any warning of his constitutional rights by the arresting officer, but it does not appear that he was questioned or that he made any statement during this period except, as above noted that he was a "user" and an admission, brought out during cross-examination of the arresting officer and not objected to by either defendant, that the gun was his. On arrival at the station an officer advised Gorman that he could telephone a lawyer. The District Attorney arrived at 4:00 or 4:30 the next morning and advised Gorman of his constitutional rights. Apparently, nothing further happened until some time between 4:30 and 7:15 a.m. when an FBI agent began to interview Gorman, after again advising him of his right to remain silent, to call an attorney, to have an attorney provided for him if he could not afford one, and of the fact that anything said might be held against him.

Gorman (still posing as Conner) said that he was the employee of a firm, that his boss was a man named Noel, and that he had been staying at Courtesy Inn in Fort Lee, New Jersey. At the time of this interrogation two slips of paper, apparently part of the contents of Gorman's wallet, were lying on the table and were taken by the FBI agent. One was a receipt from a motel in Seekonk, Massachusetts, on the Rhode Island border, tending to show that Gorman had spent two nights there a week before the robbery. The other was a hotel telephone slip addressed to Noel, reporting that a Mr. Conner had called him.

At the conclusion of this interview the agent referred to searching the motel room and "again asked him if he had any objection, and he said, 'Go ahead; look in the room.'"

After 7:30 a.m. a group of FBI agents arrived at the Courtesy Inn and searched room 23. They found a receipt, on the back of which was the notation: "Holiday Rockville Cent 504 OR 8-1300 Ext 504". They also found a Courtesy Inn telephone charge receipt reflecting a call on September 7, 1964, to OR 8-1300. Other items seized were a box of .38 caliber cartridges and a shirt with a laundry mark "Noel".

At 10:00 a.m. another group of FBI agents arrived at the Holiday Inn Motel in Rockville Center, New York, the telephone number of which was OR 8-1300. Their purpose was to "check out who occupied" room 504. They knocked on the door. It was opened by a man (defendant Roche) who identified himself as Noel. The agents identified themselves. Noel (Roche), in the process of shaving, invited them to come in and be seated. They urged him to continue and waited

---

2. This testimony was volunteered by the arresting officer in a discursive answer to the Assistant United States Attorney's question: "After placing the defendant Gorman under arrest, did you make a search of his person?" Counsel for Gorman moved to strike and to declare a mistrial, on the ground that the statement was elicited before Gorman was warned of his rights. After an extended bench conference, the motion for mistrial was denied and, we can only assume through oversight, no further action was requested or taken on the motion to strike. Since the answer was clearly not responsive, it should have been stricken. But we cannot conclude that this one statement would be significantly prejudicial before a jury that had just heard testimony that Gorman was injecting himself in the company of known addicts.

for ten to fifteen minutes. Roche asked them what he could do for them. An agent replied that he could possibly be of assistance in a case they were working on. Roche said he would be glad to help in any way he could, and that he was a businessman from Texas, one of the owners of Conner & Noel Sales Company, dealers in educational equipment.

After Roche finished shaving and dressing, an agent asked if he knew Gorman or had received any calls from New Jersey. Roche then asked what this was all about. An agent told him they were investigating a robbery and said that if he was involved in any way he did not need to reply and could have an attorney. Roche reiterated that he wanted to help and that he was on a business trip. He said he did not know Gorman and offered to call his home office to see if someone of that name had been hired in his absence. As to phone calls, he said he had not received any, but it was possible that some could have been made or received by a girl who had been staying with him. Discussion turned to his company's products—models of isotopes and atoms for teaching purposes. He said that he had samples in his suitcases. An agent asked if they could look at them. Roche replied that they could. Another agent asked "Do you have any objection to our looking in your luggage?" Roche said, "Be my guest."

They found a loaded .357 magnum revolver and a substantial amount of currency in an attache case; and in a suitcase, over $35,000 in a shopping bag and six bullets. An agent said, "You have been kidding us." Roche replied, "What else could I say?" Roche was again advised of his right to remain silent and to have counsel. He was then arrested. A Rand McNally Road Atlas of Connecticut, Massachusetts, and Rhode Island was taken from the top of a bureau. When the agents brought Roche down from his room on the fifth floor to the parking lot, they asked if he had other guns in his car and he said he did not. They asked if they could take a look. He replied, "Go right ahead. There is nothing in there." The agents found a hat (bearing a "Providence, R. I." label in the sweatband), some .38 and .45 caliber bullets, a holster for a snub-nosed revolver, some walkie-talkie radio equipment, sun glasses, and several other items.

While nothing approaching a confession by either defendant was introduced in evidence, there were four separate searches claimed to be illegal by one or both of the defendants: of Gorman's automobile at the time of his arrest; of Gorman's room at the Courtesy Inn [3]; of Roche's luggage; and of Roche's auto.

■■ The search of Gorman and his car was clearly proper as incident to the arrest. Although the police then had possession of the car and the opportunity to seek a warrant, there is every reason to tolerate an immediate search to look for weapons, equipment or supplies connected with the crime, means of escape, or information that might lead to accomplices or, in the case of the narcotics arrest involved here, to sources of supply and means of distribution. United States v. Gorman, supra note 1, 355 F.2d at 154–155, and cases there discussed: Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Adams v. United States, 118 U.S.App.D.C. 364, 336 F.2d 752 (1964), cert. denied, 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed.2d 567 (1965).

3. In fact, it appears from the record that neither defendant objected to the admission of the evidence found in Gorman's room, although Roche might have argued that the inadmissibility of that evidence, which appears to be the principal information leading the FBI to him, requires exclusion of everything developed in his interview at the Holiday Inn. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Nevertheless, we think the record fairly presents the question.

■ The search of Gorman's motel room poses a different question. Neither incident to the arrest nor pursuant to a warrant, it can be supported only on the ground that Gorman voluntarily consented to it in the interview at the police station. The ground rules for determining whether purported consent validates a search are well-known and often repeated: the consent must be seen to be an "intentional relinquishment or abandonment of a known right". Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1937). It must be "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion * * *." Simmons v. Bomar, 349 F.2d 365, 366 (6th Cir. 1965). And, since arrest carries its own aura of coercion, the burden on the government to show voluntary consent is "particularly heavy". Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649 (1951); Villano v. United States, 310 F.2d 680 (10th Cir. 1962). Nevertheless, each case stands on its own facts, and the heavy burden may be carried. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944). See generally Annot., Validity of Consent to Search Given by One in Custody of Officers, 9 A.L.R.3d 858 (1966). We think it is here.

■ Here Gorman's conduct did not amount to substantial cooperation with the police. Cf. United States v. Smith, 308 F.2d 657 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963). Nor is there clear evidence of a

hope (albeit mistaken) that the search would quell suspicion. Cf. United States v. Dornblut, 261 F.2d 949 (2d Cir. 1958), cert. denied, 360 U.S. 912, 79 S.Ct. 1298, 3 L.Ed.2d 1262 (1959).[4] Nevertheless, the consent did respond to a specific question whether he would object to a search of the room [5], after he had twice been advised that he need not answer any questions and that he might have a lawyer if he wanted one.

■ The facts before us lack the aroma of coercive haste and purported consent following close on the heels of the arrest which appears in both Judd v. United States, supra, and Channel v. United States, 285 F.2d 217 (9th Cir. 1960). In *Judd*, the suspect was arrested as he entered a friend's room, was taken to jail, interrogated for several hours, and then at 2:00 a. m. taken, handcuffed, to his apartment in the custody of four officers, where a search was made. In *Channel*, the suspect was arrested in a parking lot, questioned at an FBI office for 30 to 45 minutes, at the end of which time officers left to make a search of suspect's apartment. In both cases the defendants, asked whether they had certain items at home, said they did not, and declared that the police could go look and see that they did not. In each case the court held that the declaration could not be interpreted as consent to a search without a warrant. That may be so, but when the accused is directly asked whether he objects to the search, there must be at least some suggestion that his objection is significant or that the search

4. But this case is plainly not like Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819 (1954), or United States v. Gregory, 204 F.Supp. 884 (S.D.N.Y. 1962), where the court inferred coercion on the assumption that no defendant protesting his innocence would voluntarily consent to a search when he knew seriously damaging evidence would be found. As far as this record shows, the FBI found at the Courtesy Inn only some pieces of paper, a shirt, and a box of bullets for a gun that Gorman was already known to have. Even if we speculated that he must have realized that those items would be found, we need not

assume that he would have thought them significant.

5. In fact, the testimony suggests that the request to search was made at least twice. Cf. United States v. Thompson, 356 F. 2d 216, 219–221 (2d Cir. 1965), cert. denied, 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed. 2d 675 (1966), where the defendant (before arrest) had three opportunities to object to entrance and search. In that case, as here, there was no "evidence of exhaustive questioning, persistent demands or coercive action on the part of the police." 356 F.2d at 220.

waits upon his consent. When this is combined with a warning of his right to be silent, and his right to counsel, which would seem in the circumstances to put him on notice that he can refuse to co-operate, we think it fair to infer that his purported consent is in fact voluntary. There is no suggestion in the record that the police or the FBI agents pressured Gorman to give his consent, made any threats or promises, or considered the motel room as anything except a loose end which good police procedure required to be tied up.

▮ We cannot accept the recently suggested rule that a specific warning of fourth amendment rights is necessary to validate a warrantless search after the suspect has been arrested. United States v. Nikrasch, 367 F.2d 740 (7th Cir. 1966); United States v. Blalock, 255 F. Supp. 268 (E.D.Pa.1966). Contra, State v. McCarty, Kan., 427 P.2d 616 (May 13, 1967). Although the analogy with Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), has a surface plausibility, we do not think that the Miranda prescription, formulated to give threshold warnings of fifth and sixth amendment rights at the earliest critical time in a criminal proceeding, must or ought to be mechanistically duplicated when circumstances indicate the advisability of requesting a search. In the first place, advocacy of an automatic second-warning system misunderstands and downgrades the warnings required by *Miranda*. Their purpose was not to add a perfunctory ritual to police procedures but to be a set of procedural safeguards "to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it." 384 U.S. at 444, 86 S.Ct. at 1612. These constitute "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere." Id. at 468, 86 S.Ct. at 1624. The obligation of the interrogators is not discharged by the adequate and effective appraisal of the accused's rights. "If

* * * he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Id. at 444–445, 86 S.Ct. at 1612. While the police interrogators must faithfully carry out *Miranda's* mandate at the threshold, they may then proceed to elicit responses, however incriminating, without further specific warning. To single out for further warning a request to search premises of an accused is to assume that a different order of risks has not been covered at the threshold. But that things which might be found in a search could be used against an accused seems implicit in the warning of the right to remain silent which, as the Court observed, is calculated to make him "more acutely aware * * * that he is not in the presence of persons acting solely in his interest." 384 U.S. at 469, 86 S.Ct. at 1625.

▮ Moreover, the rules governing searches are concerned not with the exclusion of unreliable evidence (such as a confession stemming from fear or force) or with the exclusion of self-incriminating statements (whether reliable or not) or with the need to assure a defendant that he may have a lawyer before any further interrogation, but with the maintenance of civilized standards of police practice. The objective of this policy would seem to have been achieved when police have given the basic *Miranda* warnings, when a defendant subsequently voluntarily submits to an orderly interrogation free from any coerciveness other than that implicit in the fact of arrest and custody, when a straightforward request for permission to search is made, and when an unambiguous and positive response is received.

We therefore see no reason in policy or precedent automatically to borrow a procedure adapted to one set of constitutional rights at one stage of a criminal proceeding and apply it to a quite different right, serving quite different purposes, at another stage.

■■■ As for the search of Roche's luggage at the Holiday Inn, we cannot readily imagine a better example of proper police investigative practice. Granted that when they knocked on Roche's door, the FBI agents knew enough to suspect that he might be Gorman's accomplice[6], no shred of evidence supports any theory that they intended either to arrest him or to search his effects. Cf. Com. of Massachusetts v. Painten, 368 F.2d 142 (1st Cir. 1966), cert. granted, 386 U.S. 931, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967). Roche was warned, even at this stage, that he need not talk to the agents at all. To be sure, when he said that his luggage contained samples, and the agents asked to see them, Roche faced a dilemma. To allow the search would surely precipitate arrest; to refuse it would harden the suspicion that he was trying to dispel. Nevertheless, the pressure exerted on a criminal by the realization that the jig is up is far different from the deliberate or ignorant violation of personal right that renders apparent consent ineffective. As we have recently said, "Bowing to events, even if one is not happy about them, is not the same thing as being coerced." Robbins v. MacKenzie, 364 F.2d 45, 50 (1st Cir.), cert. denied, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966). And, as the Second Circuit has observed on this very point: "Where, as here, no force or deception was either used or threatened, we see no reason why a court should disregard a suspect's expression of consent simply because efficient and lawful investigation and his own attempt to avoid apprehension had produced a situation where he could hardly avoid giving it." United States v. Gorman, supra note 1, 355 F.2d at 159.

■ The search of Roche's car, like the search of Gorman's motel room, took place after a specific request elicited apparent consent and after Roche had been warned in detail of his right not to answer questions and his right to have a lawyer. Our observations with respect to the search of Gorman's room apply equally to this last search.[7]

■ Defendant Gorman also seeks to upset the verdicts on the ground that, while the bank in this case was shown to have been insured by the Federal Deposit Insurance Corporation as recently as August 1, 1962, and while a witness testified that at the time of trial, in 1966, it was still a member, there was no evidence of membership as of the date of the crime in 1964. There was, however, testimony that the required periodic reports had been filed up to the end of 1965, and there was no suggestion that the bank's membership had been revoked. On this state of the record the jury would have been reasonable in not entertaining a doubt that the requisite membership was in force on July 31, 1964.

■■ The remaining claims of error are directed to the conduct of the trial. One grouping of such claims relates to various bits of testimony refer-

6. Indeed, the Second Circuit has opined in dictum on the somewhat different record before it that the agents may have had probable cause to arrest Roche at the outset. United States v. Gorman, supra note 1, 355 F.2d at 159–60.

7. Moreover, were it necessary, it might be argued that in the special circumstances of this case, the search of Roche's car was incident to his arrest. Here, the search followed the arrest closely in time, and the car was parked at the motel near Roche's room. It was as much on the "premises" within his "immediate control" as were the areas searched in United States v. Rabinowitz, supra, and Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and there was as much reason to look for fruits or implements of the crime. And the car, unlike an office or the rooms of a house, was movable. Granted that Roche, in custody, could not remove the car or destroy the evidence (if any), at the time of the arrest the agents could have no assurance that there was no accomplice at large who could.

ring to other crimes than that charged. The arresting officer stated that there was nothing to indicate that money found in the trunk came from Rhode Island. This, however, was elicited by defendant's counsel. The testimony of the arresting officer that defendant Gorman admitted that he was a "user" of narcotics was, as we have noted, hardly likely to prejudice the jury significantly under the circumstances. Another witness, asked if he had seen defendant Gorman since the crime, stated that he had seen him at the New Haven State Prison. The answer was spontaneous, did not necessarily imply that another crime had been committed, and in any event was ordered stricken. Defendant was adequately protected. The final error claimed in this grouping is the admission of an FBI agent's testimony that he explained the purpose of the visit to Roche as "going into a bank robbery which had occurred before". The answer, given in course of cross-examination, passed without objection and was not further elaborated. It could not have prejudiced defendant.

In admitting into evidence a hotel receipt tending to prove that Gorman was in the vicinity of the crime exactly one week prior to its commission, the trial judge acted within permissible discretion. The judge's interruption of counsel's argument that Gorman had no previous narcotics convictions was clearly within his discretion. And complaints arising out of the prosecutor's closing to the jury must be relegated to the catalogue of trivia.

The impression which we ineradicably receive from a careful reading of the entire transcript of this seven-day trial is that the court-appointed counsel for defendants were assiduous and that the district court took every precaution to assure a fair trial. The result is attributable to the evidence, which was a product of good fortune and effective investigation.

Affirmed.