**Barry K. LEAVITT, Petitioner,**

v.

**Francis HOWARD, Warden, Adult Correctional Institution, Respondent.**

**Civ. A. No. 4577.**

United States District Court,
D. Rhode Island.

Oct. 8, 1971.

Ira L. Schreiber, Providence, R.I., for petitioner.

Donald P. Ryan, Asst. Atty. Gen., of Rhode Island, Providence, R.I., for respondent.

## OPINION

PETTINE, Chief Judge.

The petitioner's application for writ of habeas corpus presents issues under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution raised in a State trial resulting in a conviction by a jury of first degree murder.

From the trial record and an evidentiary hearing before this Court that was limited to the constitutional issues presented by the petition, I determined the relevant facts: Michael Pono, a twelve-year old boy was brutally stabbed to death in the kitchen of his first floor home at 40 Amsterdam Street, Providence, Rhode Island on the morning of March 23, 1964. At 9:18 a. m. that same day, the petitioner, identifying himself as Barry Leavitt, phoned from 3 Samoset Avenue, his mother-in-law's home and told the Providence Police he had been cut at 40 Amsterdam Street. A policeman responded and found the petitioner at Samoset Avenue with a badly cut hand wrapped in a piece of underwear. He told the patrolman that while in his second floor tenement at Amsterdam Street that morning, he heard both the outside and inside doors on the first floor close and then heard screams. He ran to investigate. As he reached the bottom of the hallway stairs, he encountered a man coming out of the kitchen of the first floor tenement who assaulted him. The petitioner further stated that he lost his footing and fell. Though he attempted to follow his assailant, he lost him. Upon returning to the first floor tenement, he attempted to enter but found that the door was locked. He then drove to his mother-in-law's house at 3 Samoset Avenue and made the aforesaid phone call.

After being taken to the hospital by the police for treatment of his cut hand, the petitioner was brought to the police station to view photographs in an attempt to identify his alleged assailant. During this time, but before he arrived at the police station at 11:15 a. m., a white 1963 Ford with registration "BKL", lawfully parked at or near 3 Samoset Avenue, was identified as the car that had been driven there by the petitioner from Amsterdam Street. At 10:53 a. m., without any kind of warrant or consent, this car, registered and owned by the petitioner's wife, was impounded and towed to the police garage as a "matter of policy." Immediately following the 9:18 a. m. call from the petitioner, the police not only dispatched officers to Samoset Avenue but to Amsterdam Street as well. At 9:25 a. m., the police entered the Pono tenement. Michael Pono was lying dead, fully clothed on the blood-stained floor of the kitchen—death due to multiple stab wounds. The back hallway leading to the door of the Pono tenement and the stairway to the second floor were blood

stained. Near the body was found an elongated washer and a wrist watch, both of which were introduced as evidence during the State court trial.

At or about 11:15 a. m., police Lt. O'Connell started questioning the petitioner. Lt. O'Connell stated that within five minutes, the petitioner became a prime suspect due to three things in combination:

1) that petitioner said he never entered the Pono apartment because the door was locked, whereas the police found it unlocked;

2) that petitioner had underwear around his cut hand that came from the Pono apartment; and

3) that petitioner said he pursued the assailant out the door and then went to Samoset Avenue, whereas there were blood stains from the Pono apartment to the petitioner's second floor apartment.

Petitioner was then told of his right to counsel and silence, that if he did talk, whatever he said could be used against him. The petitioner denies this, testifying he received no warning of rights against compulsory self-incrimination or to assistance of counsel. The police testified that after such warning was given, the watch found at the body was shown to the petitioner and that he identified it as his own but could not explain its presence in the Pono apartment. This all took place at about 11:30 a. m. About 11:40–11:45 a. m., the petitioner was told to empty his pockets and place the contents on the table before him which he did. The contents consisted of car keys, license and registration. Within five minutes thereafter, another police officer who had been in and out of the questioning room "told" the petitioner, "I would like to look at your car." The petitioner's response was, "Go ahead," whereupon he picked up the keys and threw them to the officer. The petitioner contends, and the officer denies, that he also said that if the car was going to be driven to be careful of the burned clutch. Another variance in the testimony is the police denial of the peti-

tioner's contention that the officer reached for the keys as he made the statement.

The police, now armed with the keys, searched the vehicle and found a broken, blood-stained hunting knife in the trunk, which was received in evidence during the State trial together with the elongated washer found in the Pono apartment, which fit said knife. From the transcript, it appears that at the trial, the petitioner denied ownership of this knife, whereas the police testified that he admitted it belonged to him during the interrogation.

At the Providence Police Station, four attorneys, secured by the petitioner's wife at his request, had been denied access to the petitioner from before 1:30 p. m., the time of arrival of the first attorney, until 9:30 p. m., when one was finally permitted to see him. In the hearing before me, the petitioner testified that his requests to talk with his lawyer were denied and this is hardly disputed by the respondents.

On January 16, 1968, the Supreme Court of Rhode Island overruled the petitioner's Bill of Exceptions, State v. Leavitt, 103 R.I. 273, 237 A.2d 309. On October 14, 1968, the United States Supreme Court denied the petitioner's application for writ of certiorari. Thereafter, on two occasions, the petitioner sought habeas relief in this court and each time it was denied without prejudice in order to complete exhaustion of State remedies. On March 24, 1971, the Rhode Island Supreme Court denied a petition for a habeas writ (Leavitt v. Howard, 1358 MP) and on April 13, 1971 the instant application was filed.

The March 24, 1971 petition to the Rhode Island Supreme Court raises all the issues presented here. However, the respondent again urges this Court to relegate this matter to the State courts because the petitioner's argument that after his arrest his attorneys were prevented from seeing him over an eight-hour period was not put to the Rhode Island courts in the same light as pre-

sented here. Frazier v. Langlois, 412 F. 2d 766 (1st Cir. 1969).

■ The exhaustion of State remedies doctrine is a matter of comity and though the 28 U.S.C. § 2254 exhaustion limitation is part of the statutory language, decisional evolvement has fashioned exceptions—it does not operate to limit this Court's jurisdiction to entertain petitions for habeas corpus. Ex Parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572 (1944); Bowen v. Johnson, 306 U.S. 19, 27, 59 S.Ct. 442, 83 L.Ed. 455 (1939); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed. 837 (1963).

In deference to federalism, the Rhode Island State courts have had ample opportunity to resolve the substance of the petitioner's contention that his constitutionally protected right against an unreasonable search and seizure had been violated.

### The Fourth and Fourteenth Amendment Claims

■ The petitioner contends that the towing away and impounding by members of the Providence Police Department of "his" vehicle [this automobile was actually owned by and registered to the petitioner's wife. It will be referred to as "his" vehicle] constituted an illegal seizure under the United States Constitution and that any articles subsequently obtained by them from it were tainted as such under the "poisoned fruits" doctrine of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) and that the State has not sustained its burden of proving that he intelligently gave consent to search "his" automobile. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). A State prisoner may raise a claim on federal habeas corpus that evidence that was used against him was obtained by illegal search and seizure. Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968).

■ In the exercise of my discretion, I deemed it necessary to hold an evidentiary hearing upon the applicant's constitutional claims. The Rhode Island Supreme Court applied the "clearly erroneous" standard and upheld the findings of the trial court that the petitioner consented to the search of his vehicle. I am not so restricted, for I do not sit in appellate review of the State court proceedings. This Court is empowered and has a duty, given the facts adduced at the State level, to make its own factual determination where a disputed factual issue is not fairly supported by the record as a whole. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L. Ed.2d 770 (1963).

"* * * Where the fundamental liberties of the person are claimed to have been infringed, we carefully scrutinize the state-court record [citations omitted]. The duty of the Federal District Court on habeas is no less exacting."

Townsend v. Sain, *supra*, at 316, 83 S.Ct. at 759.

At page 312, 83 S.Ct. at page 756, we find the following language:

"It is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues. * * * the power of inquiry on federal habeas corpus is plenary. * * * the federal court to which the application is made has the power to receive evidence and try the facts anew."

The court then held,

"* * * that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; * * * (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a

full and fair hearing." [1] Id. p. 313, 83 S.Ct. p. 757.

and finally stated the State and the petitioner must be given the opportunity to present other evidence as to the disputed issues over and above the record.

■ On the basis of all the evidence, I find:

1) That within the teachings of controlling case law, the petitioner did not consent to the search of his automobile.

2) The trial court's findings that the petitioner consented to the search of his vehicle is not fairly supported by the evidence of record.

3) The seizure of the petitioner's vehicle was illegal.

### Illegal Search and Seizure of Petitioner's Automobile

It is infinitely clear that the seizure of the petitioner's car was starved of probable cause—not a whisper of such evidence existed. The respondent's argument in justification, that at the actual time of seizure the police believed it to be the car of a complainant rather than an accused and that it was taken as a matter of "police policy," is of no avail. It was seized at 10:53 a. m., and at this juncture the investigation revealed the murder and a complainant who claimed he had been cut by the sought-for-assailant, but the evidence was bare of any suspect. Furthermore, it is uncontradicted that the car itself in appearance was devoid of any nexus with the crime. The cases in this area are legion, overflowing with judicial cerebrations drawing distinctions, condoning or rejecting searches and seizures. However, measured by any standard, I find no justification for the police seizure of this lawfully parked automobile, ostensibly innocent of any content of criminal evidence related to the murder in question. It was patently unwarranted. The violation of the Fourth

and Fourteenth Amendments federally protected rights calls for the court's condemnation and sanction. The police may not, as here, in the name of expediency or "police policy" seize a person's vehicle without warrant and without probable cause. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). If the police had probable cause to believe that the vehicle was evidence of crime, or if they reliably believed that it was more likely than not that the vehicle contained contraband, they had ample opportunity, under the facts here, to comply with the constitutional mandate and obtain a warrant. Searches and seizures conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment.

The most recent pronouncement by the United States Supreme Court, Coolidge v. New Hampshire, *supra,* leaves little doubt as to the seizure at bar. If in *Coolidge* five justices could agree that the seizure of a lawfully parked automobile in front of the suspect's house was illegal even though there existed probable cause to believe it contained murder evidence and could see it in plain view, then in the issue before this Court, it is not over-expansive to say that there was an egregious violation of the petitioner's constitutional rights.

Coolidge v. New Hampshire, *supra,* teaches that although one is lawfully on the premises, still it is not enough, for even discovery of evidence in plain view must be inadvertent to justify a warrantless search. As in Coolidge v. New Hampshire, *supra,* here the police had ample opportunity to obtain a warrant— the car was in the police garage, immuned from any outside tampering. In short, the discovery of the knife was not inadvertent but indeed an exploitation by the police of the initial illegality visited upon the petitioner. Silverthorn Lumber

---

1. See 28 U.S.C. § 2254(d). Conducting a hearing was necessary in any event because of the testimonial trial record on the critical consent search issue. I do not reach the question of whether this post-

*Townsend* code negates such need when the "State level" evidence is "[in]correct" on the face of the record for any of the reasons enumerated.

Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) ; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) ; Wong Sun v. United States, *supra;* cf. Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).

The exclusionary rule fashioned by the United States Supreme Court decisions, which this Court is bound to apply, renders all evidence obtained from illegal searches and seizures and the fruits thereof inadmissible in State court proceedings. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ; Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). In its application here, the initial intrusion being constitutionally unwarranted, nothing seen or found in petitioner's wife's vehicle may legally form the basis for an arrest, or search warrant or for testimony at petitioner's trial since the State would be using the fruits of a Fourth and Fourteenth Amendment violation. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ; Mapp v. Ohio, *supra.* Here the initial illegal seizure of the vehicle necessarily taints the evidence of the knife found in the trunk. Therefore, the questions arises of whether there was a subsequent consent to search which sufficiently attenuates the primary stain as to make such evidence admissible. This I will discuss infra. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### The Consent to Search

I cannot look with favor on the consent search theory which the respondent argues to this Court. The very fact that it does not require probable cause, nor need be incident to an arrest and its dramatic waiver of constitutional rights of privacy demands a close scrutiny of the factual setting in which the consent was allegedly given. A consent to search must be based on a showing of " * * * an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst,

304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 146. The burden of proving such consent is on the government. United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951) ; Burke v. United States, 328 F.2d 399 (1st Cir. 1964).

Here the petitioner was in custody and having been informed he was under arrest, he relinquished the keys to the seized vehicle. The burden on the government is greater when consent is claimed to have been given while the defendant is under arrest. United States v. Page, 302 F.2d 81, 84 (9th Cir. 1962), cited in Burke v. United States, *supra,* 328 F.2d at 402. The detailed search of the person at the moment of his arrest at the police station was, of course, constitutionally justified. Every arrest of a person necessarily involves a seizure of the person. So it may be said the police lawfully seized the keys to the vehicle but this does not validate the use of such keys to work a warrantless search. It is the opinion of this Court and it so finds that the surrender of the keys falls far short of any legally acceptable standard of consent. I reach this conclusion because of the coercive ambience of the relinquishment and the utter void of evidence showing that the defendant's verbal act was done "knowingly and intelligently."

Before reaching each of these issues, I dispose of the respondent's argument that the search was incident to a lawful arrest. In my opinion, this is so indigestable an argument that I am hard pressed to accept that the State is seriously making this contention. The accused was in the "custody" of the police when the car was seized at another place and was closely followed by a search. This is simply not incident to the petitioner's arrest. Coolidge v. New Hampshire, *supra;* Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) ; Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968).

There is no easy yardstick to measure coercion, but taking the facts as a whole,

it is readily apparent that there was coercion here. The accused was under arrest in a police station; he was told to empty his pockets, which he did, placing the keys on a table before him. At this point, the officer told the petitioner, "I would like to look at your car" while at the same time reaching for the keys—the version of the testimony this Court accepts. It was then the petitioner said, "Go ahead" and tossed them over. Did the petitioner have a choice? Only artless simplicity can compel such a conclusion. This is accentuated by the compelling testimony that the petitioner's repeated requests to see his lawyer fell on deaf ears. In further aggravation, as an insight to the prevailing station house attitudes, there is the convincing testimony of one of the attorneys who, for eight hours on the day in question futilely pounded the police barrier of "authority" in an attempt to see his client. Further, the "consent" was given around 11:45 a. m., a few minutes after petitioner was told he was accused of murder and after half an hour of interrogation. It is doubtful whether the "consent" was an exercise of free will. Petitioner hardly had time to clear and arrange his mind between his custody and being charged with murder and his "consent." Cf. Rogers v. United States, 330 F.2d 535 at 541 (5th Cir. 1964); Phelper v. Decker, 401 F.2d 232, 237 (5th Cir. 1968).

The Rhode Island Supreme Court quite accurately said in State v. Leavitt, *supra*, 237 A.2d at 318–319:

"The argument that, under the conditions prevailing at the police station, defendant's acquiescence to the search was submission to authority rather than consent, is more troublesome. We are unrestrainedly in accord with the proposition that an accused's consent to a search is a waiver of the protection guaranteed to him by the constitutions of this state and the United States. Such waiver is never to be presumed. It must be clearly shown to have been freely and knowingly given, uninduced by not only actual but implied duress. Judd v. United States,

89 U.S.App.D.C. 64, 190 F.2d 649 (1951); Channel v. United States, 285 F.2d 217 (9 Cir. 1960).

Where, as here, the asserted consent is obtained from one under arrest, custodially secured in a police station with its attendant ambient of officialdom, there is present a situation which suggests the probability that the acquiescence was submission to authority rather than an intelligent waiver. See *Judd, supra.*

Even so, it has never been held that a finding of consent, freely and intelligently given, is precluded as a matter of law when obtained from one under arrest and officially secured. That valid consent was obtained under such circumstances is still a question of fact to be determined by the trial justice in the first instance, although the burden on the state is to establish such consent by clear and convincing evidence. United States v. Page, 302 F.2d 81 (9 Cir. 1962)."

In my opinion, independently reviewing the transcript testimony and the evidentiary hearing before me, I find the State has failed in this burden.

Turning now to the consent itself, this Court finds nothing in this record to suggest that the petitioner was in fact aware of his Fourth Amendment right to refuse to give his consent to search the vehicle. In appellate review, the Rhode Island Supreme Court quoted heavily from Gorman v. United States, 380 F.2d 158 (1st Cir. 1967) holding that an accused need not be informed of his right to refuse to consent to a search before a legal consent can be had. However, no independent finding was made by the Rhode Island Supreme Court as to this issue. As has been previously stated, they posited their holding on the "clearly erroneous" doctrine reinforced by the finding of the jury, after proper instructions, that the questioned evidence was admissible. As discussed *supra,* this is not binding on me and I ventured forth on the evidentiary hearing to independently determine the facts, mindful of the awesome power of federal district courts

in this area. It causes me to conclude that Gorman v. United States, *supra,* is factually distinguishable and therefore not controlling.

■ There is no per se rule that a suspect be given specific warning of his Fourth Amendment rights in order to validate a warrantless search. *Gorman, supra;* United States ex rel. Harris v. Hendricks, 423 F.2d 1096, 1101 (3rd Cir. 1970). The failure to advise a defendant of his right to refuse to consent to a search, though not determinative, is, however, a proper factor to consider as to whether the petitioner was in fact aware of his right to refuse to consent. In *Gorman, supra,* the Circuit Court of Appeals itself considered that the giving of such a warning was a factor to be considered in arriving at their finding that the search there was a consensual one. Simply, in *Gorman,* the court declined to condition its finding of consent to search on a *Miranda*-like warning. However, it is equally clear that the court found an acceptable penumbra of constitutional safeguards stemming from the original *Miranda* warning and thus concluded that:

> " * * * advocacy of an automatic second-warning system misunderstands and downgrades the warnings required by *Miranda.* Their purpose was not to add a perfunctory ritual to police procedures but to be a set of procedural safeguards 'to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it.' "

Gorman v. United States, *supra,* 380 F.2d at 164, citing Miranda v. State of Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694. Herein lies the difference, for in this case I find no warning at the time of arrest analogous to that given in *Gorman.*

True, this case was all before Miranda v. Arizona, 384 U.S. 444, 86 S.Ct. 1602, which refined the warnings to be given an accused, and so it may be said the warning as given in this case was sufficient. Nevertheless, it cannot be equated to a *Miranda*-like warning. Certainly I cannot find that the skeletal statement made to the accused, " * * * overcom[es] the inherent pressures of the interrogation atmosphere." Id. at 468, 86 S.Ct. 1624. When a *Miranda*-like warning is given, then, as Judge Coffin stated, " * * * advocacy of an automatic second-warning system misunderstands and downgrades the warnings required by *Miranda.* Their purpose was not to add a perfunctory ritual to police procedures * * *."

The *Gorman* case is further distinguishable. The F.B.I. agents confronted Gorman's accomplice Roche at the Holiday Inn Motel. There the agents *asked* Roche, *"Do you have any objection to our looking in your luggage?"* Roche replied, "Be my guest." As noted by Judge Coffin:

> "[W]hen the accused is *directly asked whether he objects* to the search, there must be at least some suggestion that his objection is significant or that the search waits upon his consent. When this is combined with a warning of his *right to be silent,* and his *right to counsel,* which would seem in the circumstances to put him on notice that he can refuse to cooperate, we think it fair to infer that his purported consent is in fact voluntary." Id., 380 F.2d at 163–164. (Emphasis added)

Here, consent cannot be measured so simply. Petitioner was not asked whether he objected to a search of his car. On the contrary, he was told to relinquish the keys to his car and was told, "I would like to look the car over * * *" Further, Leavitt testified that he was never warned of his right to remain silent or his right to counsel. The three elements on which the *Gorman* court relied to build its inference of voluntary consent are not present here. The conversation relied on in *Gorman* to show consent occurred before Roche was arrested. There was no aura of coercion present. The consent as given, "did respond to a specific question whether he would object to a search of the room." Id. at 163.

As to Gorman, his motel room was indeed searched without a warrant not incident to an arrest. The F.B.I. referred to searching the motel room and again asked [Gorman] if he had any objection and he said, "Go ahead; look in the room."

The " * * * consent * * * respond[ed] to a specific question whether he would object to a search of the room, *after he had twice been advised* that he need not answer any questions and that he might have a lawyer if he wanted one." Id. at 163.

Leavitt was not asked if he had any objection to a search of his vehicle; the conversation relied on by the State to show consent occurred *after* petitioner was arrested—an aura of coercion did exist.

The burden on the government of showing consent to search would seem to be twofold—(1) of showing the consent was "an intentional relinquishment or abandonment of a *known* right." Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L. Ed. 1461 (1938) (emphasis added); and (2) of showing the consent was voluntary. Judd v. United States, 89 U.S.App. D.C. 64, 190 F.2d 649. Both of these requirements are set out in *Gorman, supra,* 380 F.2d at 163. The question of intelligent waiver was seen as distinct from the issue of voluntariness in United States v. Blalock, 255 F.Supp. 268 (E.D. Pa.1966). While *Gorman* rejects *Blalock's* precise holding that a specific Fourth Amendment warning must be given to validate a warrantless search, 380 F.2d at 164, I do not understand the *Gorman* court to have rejected *Blalock's* methodology of examining both knowl-

edge and voluntariness before finding consent.[2] Rather *Gorman* seems, by emphasizing the use of *Miranda* warnings, "to inform accused persons of their right of silence" and to inform accused persons of their right to counsel,[3] to say that the waiver must be *knowing,* albeit that such knowledge is sufficiently given by the initial *Miranda*-type warnings:

"To single out for further warning a request to search premises of an accused is to assume that a different order of risks has not been covered at the threshold, but that things which might be found in a search could be used against an accused seems implicit in the warning in the right to remain silent * * *." 380 F.2d at 164.

Therefore, it is appropriate that we consider the question of whether petitioner's waiver of his Fourth Amendment rights was intelligent and knowledgeable.

■ In considering whether petitioner's waiver was knowing, I focus both on the facts of his interrogation and on his person. *Gorman* rests heavily on the fact that defendant there was warned of his right to remain silent and of his right to counsel. Petitioner here denies that he received any constitutional warnings. The police lieutenant testified that petitioner was told of his right to silence and to counsel. Some doubt is thrown on this testimony by the undisputed testimony that several attorneys, who had been called by petitioner's wife, attempted to see petitioner at the police station and were not allowed to see him until around 9:00 p. m. that night. It certainly has not been established beyond argument that petitioner was advised of his rights

---

2. It is noteworthy that *Gorman* cites Johnson v. Zerbst, *supra* for the proposition that waivers must be knowing and intelligent, rather than the Fourth Amendment case of Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L. Ed. 436 (1948), which, unlike *Zerbst,* links the requirement of knowledge to the issue of coercion. 333 U.S. at 13, 68 S.Ct. 367. See Note, Consent Searches: A Reappraisal after Miranda v. Arizona, 67 Col.L.Rev. 130, 147 n. 91 (1967).

3. The function of the presence of counsel as an informational tool for the accused was recognized by Johnson v. Zerbst, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1966):

"The purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights * * *."

to silence and to counsel. If not, it cannot be inferred that there was any implicit warning of Fourth Amendment rights.

Among the critical factors to be considered in determining whether there was consent are "the setting in which the consent was obtained, what was said and done by the parties present with particular emphasis on what was said by the individual consenting to the search, and his age, intelligence and educational background." United States ex rel. Harris v. Hendricks, 423 F.2d 1096, 1099 (3rd Cir. 1970). Because petitioner did not have counsel with him during interrogation, he lacked an "alter ego trained in law and therefore equipped to make the decisions which have significant legal consequences." Note, Consent Searches: A Reappraisal After Miranda v. Arizona, 67 Col.L.Rev. 130, 154 (1967). So I must determine the knowledge that petitioner himself possessed. Petitioner is a high school graduate who has taken a few college level courses, though without great success. His interrogation and "consent" followed loss of blood and hospital treatment for a wounded hand. He testified that during interrogation, his wife was allowed in to see him and that he sobbed in his wife's lap. The picture is one of a weakened, bewildered and confused man. Petitioner had never been arrested before and so was unfamiliar with his rights under criminal law from any prior experience. While he had had a high school course in civics, legal rights when arrested was not part of the curriculum. This interrogation also took place before the *Escobedo* and *Miranda* decisions and the subsequent public spotlight on criminal rights. Peti-

tioner was a man whose background did not provide him with insight into his rights in the criminal process. In the absence of any counsel to assist him, in the absence of a clear showing that petitioner was advised of his rights to silence and to counsel, and in light of petitioner's own background, I am compelled to find that there was no intelligent and knowing waiver of his Fourth Amendment rights. Rather than showing knowing waiver, the evidence shows that petitioner's permission was "an unadvised, ill-timed attempt to cooperate with law enforcement officials." United States v. Mason, 290 F.Supp. 843 (D.N.H.1968).

As Judge Coffin stated in *Gorman*, the rules governing searches are concerned with "the maintenance of civilized standards of police practice." Certainly this Court should not like by its holding to encourage the police practice of impounding cars in the police garage as a "matter of policy" when there is neither warrant nor an accompanying lawful arrest. Nor would I want to reward such a police practice of illegally impounding cars on the assumption that a later "consent"ᵧ to search would be obtained.[4] However, the Fourth Amendment is concerned with more than control of police practices; it also protects personal interests. As Justice Harlan, concurring in Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 408, 91 S.Ct. 1999, 2011, 29 L.Ed.2d 619 (1971) said, "The personal interests protected by the Fourth Amendment are those we attempt to capture by the notion of 'privacy' * * *." It is because of this personal interest in privacy that this Court stresses the importance of waiver of Fourth Amendment rights being

4. This is just the sort of situation in which the police could reasonably be expected to get a warrant prior to search. They had control over the car and there was no danger the evidence would disappear or be destroyed. This makes particularly applicable Chief Judge Aldrich's observation:

"The [Supreme] Court continues to stress the desirability of obtaining a search warrant when it is reasonably practicable to do so. * * * [for] if no penalty will ever attach to a failure to seek a warrant, as distinguished from the officers making their own, correct, determination of probable cause, warrants will never be sought." Niro v. United States, 388 F.2d 535 at 539 (1st Cir. 1968).

knowing and intelligent.[5] The government has the burden of proving by clear and positive evidence that an unequivocal, specific intelligent consent for the search has been given. Byrd v. Lane, 398 F. 2d 750 (7th Cir. 1968); United States v. Smith, 308 F.2d 657 (2nd Cir. 1962). In *Smith, supra,* the court attempted to make some order of the myriad of cases involving the legality of warrantless searches and extracted the principle that courts have found there has been no voluntary consent to search where a defendant denies his guilt but allows a search. The reasoning for such holdings is that "[N]o sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered." Higgins v. United States, 93 U.S.App. D.C. 340, 209 F.2d 819, 820 (1954). The applicability of such a principle to this case speaks for itself. The evidence found in the trunk of the car was neither well-concealed nor ostensibly innocent. See *Gorman, supra,* 380 F.2d 163 n. 4. Petitioner could not reasonably have been playing cat and mouse games with the police, attempting to deceive them into thinking him innocent by handing over the keys to his car. It would be unreasonable to assume that he voluntarily allowed this search.

■ Given the facts in its strongest possible light in favor of the government, the case subjudice is clearly distinguishable from *Gorman* but like Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649 (1951) and Channel v. United States, 285 F.2d 217 (9th Cir. 1960) cited in *Gorman, supra,* 380 F.2d at 163. This case is also like Higgins v. United States, 93 U.S.App.D.C. 340, 209

F.2d 819 (1954). See also United States v. Gregory, 204 F.Supp. 884 (S.D.N.Y. 1962). Acquiescence to search without warrant is resignation—a mere submission in an orderly way to the actions of the arresting agents. It is not that consent which constitutes unequivocal, free and intelligent waiver of a fundamental right. Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436.

■ I hold that petitioner did not knowingly and voluntarily consent to the search of his car and thus that the evidence seized from his car was taken in violation of the Fourth Amendment and so should have been excluded at trial. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). This holding does not dispose of the matter since even valid constitutional claims will not result in retrial or release if they constitute harmless error under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The federal harmless error rule is to be applied in habeas corpus proceedings just as in appellate proceedings. Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968); Luna v. Beto, 395 F.2d 35 (5th Cir. 1968). Error in illegally admitting highly prejudicial evidence casts on the respondent here the burden of showing it was harmless. Chapman, 386 U.S. at 24, 87 S.Ct. 824. Before this federal constitutional error can be held harmless, this Court must be able to declare a belief that it was harmless beyond a reasonable doubt. Chapman, *supra,* at 24, 87 S.Ct. 824; Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

■ The evidence found in the car and illegally admitted was a broken, blood-stained hunting knife which fit the

---

5. See Mapp v. Ohio, 367 U.S. 643, 656–657, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961):

"We find that * * * the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an intimate relation in their perpetuation of 'principles of humanity and civil liberty [secured] * * * only after years of struggle.'"

While *Mapp* established the exclusionary rule for violation of Fourth Amendment rights, the fundamental right to privacy on which this exclusionary rule is based also demands that an accused person know of his Fourth Amendment rights before he can be held to have waived them. This would seem to be required both by the Fourth Amendment and by the Due Process Clause.

elongated washer found under the victim's body. The conclusion that is inescapable is that admission of this evidence was prejudicial and cannot be called harmless. *Fahy, supra.* I cannot say that introduction of such evidence, which was non-cumulative and has stunning impact, was harmless beyond a reasonable doubt. Cf. Subilosky v. Moore, 443 F.2d 334 (1st Cir. 1971). Nor can I say that the rest of the evidence was so overwhelming that the tainted evidence was not a determining factor in the eyes of the jury. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); see Note, Harmless Constitutional Error: A Reappraisal, 83 Harv.L. Rev. 814, 817–819 (1970).

The writ of habeas corpus is granted; however, law and justice require that issuance of the writ be stayed and petitioner be retained in custody pending appeal, should the State of Rhode Island wish to appeal this order, and/or pending the decision of the State as to whether it wishes to retry petitioner. A new trial, if the State wishes one, must be commenced within a reasonable time.