UNITED STATES of America

v.

Jackie David MILLER.

Crim. No. 77–37–SD.

United States District Court,
D. Maine, S. D.

Dec. 13, 1977.

George J. Mitchell, U. S. Atty., Portland, Me., for plaintiff.

Gerald F. Petruccelli, Portland, Me., for defendant.

### MEMORANDUM OF OPINION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

GIGNOUX, District Judge.

Presently before the Court is defendant's motion for return of property and for suppression of evidence filed July 29, 1977 pursuant to Fed.R.Crim.P. 12(b)(3) and 41. An evidentiary hearing has been held, the issues have been comprehensively briefed and argued by counsel, and the following memorandum opinion contains the Court's findings of fact and conclusions of law as required by Fed.R.Crim.P. 12(g).

### I

#### The Facts

##### A. Events of Friday, May 13, 1977

On Friday, May 13, 1977, at approximately 5:45 a. m., Willard Muise, an employee at the Robinhood Marina, in Arrowsic, Maine, noticed a yacht, the Cold Duck, fouled in one of the marina's moorings approximately 250 yards offshore. Muise had not previously seen the craft. At about 7:00 a. m. on the same day, Muise conferred with Ralph Becker, the marina owner, who also knew nothing about the boat. Later in the day Robert Mansfield, an employee of the marina, and Becker also conferred about the boat and decided to discover the identity of the owner. To that end, Mansfield called the home port of the Cold Duck, found the marina at which it formerly had been based, and learned from personnel at the marina the name and telephone number of the former owner, Patrick Zecco. Mansfield later was able to reach Zecco, who told Mansfield that he had sold the boat to a person named Jackie Miller.

At approximately 2:45 p. m. Willard Muise rowed out to and boarded the Cold Duck. No one was aboard, and Muise returned to the marina. Because the boat was fouled in a mooring, and since the rubber dinghy aboard the Cold Duck used to ferry people from the boat to the shore had not been used for some time, Muise told Mansfield he feared a drowning might have occurred. At about 3:30 p. m. Mansfield telephoned the United States Coast Guard station at Boothbay Harbor and advised them of the events at the marina. Mansfield then left work for the day.

Sometime thereafter, the Coast Guard arrived at the marina to investigate the possibility of a nautical accident. The Coast Guard notified the Sagadahoc County Sheriff's Office of the incident. Pursuant to this notification, Sagadahoc County Chief Deputy Sheriff Charles Brawn arrived at the marina at approximately 5:30 p. m. No one was at the marina investigating the reported drowning, so Brawn departed. Brawn returned to the marina around 8:00 p. m. that evening. By that time the Coast Guard, Maine State Police, Sagadahoc County Sheriff Arthur Tainter, wardens from the Maine Department of Sea and Shore Fisheries, and marina owner Becker were at the scene probing the purported drowning.

Some two to two and one-half hours after he returned to the marina (at 10:00 or 10:30 p. m.), Brawn and Coast Guard officers boarded the Cold Duck in order to discover evidence of ownership. A search of the vessel was made, and the officers found a bill of sale and registration papers for the boat listing Jackie D. Miller as owner and Post Office Box 42 in Woolwich, Maine as his address of record. Later during the evening, after the search of the boat had been completed, Becker stated to several law enforcement officers that he suspected there had been some drug smuggling in the area, and he mentioned the name "Purmont." [1] Brawn, however, was not a party to these conversations and did not hear any discussion of drugs or drug smuggling or any mention of the name "Purmont." The Coast Guard later contacted the former owner, Patrick Zecco, and learned that Miller had paid $19,500 cash for the boat, mostly in small bills, which had been delivered in a brown paper bag. Miller had requested a receipt listing the purchase price as only $15,000.

Everyone left the marina toward midnight. Before departing, Sheriff Tainter informed the Coast Guard that he would arrange for divers to be at the marina the following morning. The Sheriff's office ordered Deputy Sheriff Frederick J. White, who went on duty at midnight, to check the boat once an hour to make sure that the boat was secure and that no one was tampering with her. White did so until his shift officially ended at 8:00 a. m., May 14.

B. *Events of Saturday, May 14, 1977*

1. *Prior to the Mill Isle Visit*

Shortly after midnight, Deputy Brawn attempted to telephone Drug Enforcement Agency (hereinafter D.E.A.) Special Agent Edward V. Drinan, Jr., the agent in charge of D.E.A. operations in Maine. Brawn suspected that the Cold Duck might be involved in drug operations allegedly taking place in Westport, Lincoln County, Maine. Brawn was unable to complete the call to Drinan. [2]

At 12:30 a. m., May 14, without knowledge of Brawn's actions, a Coast Guard warrant officer, who had attended drug "awareness" seminars conducted by Drinan for the Coast Guard, also telephoned Drinan. The warrant officer reported the peculiar facts thus far discovered about the Cold Duck and said that he was "suspicious" of the situation. Drinan stated that he would proceed to the marina the next day. Around 4:00 a. m. Drinan received a message from the Boston D.E.A. office to call the Sagadahoc County Sheriff's Office. At 8:00 a. m., the Sheriff's Office called Drinan, who replied that he was aware of the purported drowning and was proceeding to Robinhood Marina. Before heading to the marina, Drinan stopped at his office to pick up his handcuffs and his field kit, which contained *Miranda* forms, evidence envelopes, and similar matter. Drinan at this time and at all times subsequent was acting in his official capacity as a D.E.A. Special Agent.

Toward 9:00 a. m. Deputy White returned to the marina to learn of progress in the

---

1. In 1974 Becker had cooperated with law enforcement officers in an investigation of suspected drug smuggling activities in the area by a man named Purmont.

2. Brawn's information about drug operations in Lincoln County later proved to be erroneous.

investigation of the accident. There White met Deputy Sheriff Gordon E. Kinney, the deputy in charge of criminal investigation. The Sheriff's Office had contacted Kinney in the event that foul play somehow had been involved in the purported drowning. At this time divers were working the waters beneath the boat and around the marina. White and Kinney boarded the Cold Duck to help Coast Guardsmen tow the boat back to the gas dock at the marina. While aboard, the men noticed several thousand dollars worth of new electronic navigational gear, which had been installed in a sloppy, unprofessional fashion. White and Kinney also noticed three to five partially burned marihuana cigarettes in an ashtray on the deck and on the flying bridge.

Kinney noticed a navigational chart (Government Exhibit 8), folded so that the printed part of the chart was exposed, lying on the floor of the main cabin between a table and a bench. He spread the chart on the table and observed a penciled course line on the chart threading its way from Robinhood to a ledge located off Mill Isle. White and Kinney discussed the course in general terms and did not specifically refer to Mill Isle.[3] White and Kinney did not engage in a general search of the boat, and the objects they spotted on the Cold Duck were in plain view.

At 9:00 a. m., Deputy Brawn arrived at the marina. After the Cold Duck was towed to the dock, while White and Kinney were still aboard, Brawn boarded the boat. White and Kinney showed him the chart with the course line. The three speculated about possible involvement of the Cold Duck with the purported drug activities in Lincoln County. While Brawn, White and Kinney were conferring on the Cold Duck, a young man later identified as the defendant, Jackie D. Miller, drove into the marina parking lot. The time was approximately 10:00 a. m. Miller's vehicle was a late model, black Chevrolet Blazer. Marina employee Muise was working in the lot at the

time. Miller approached Muise, gave his name as Miller, and stated that he wished to lease a mooring for his boat. When Muise asked the defendant what type of boat he owned, the defendant pointed to the Cold Duck and noticed the law enforcement officers on her. Defendant inquired about their presence, and Muise answered that the men had taken the boat to the dock in order to free the mooring. Muise suggested that defendant check with the office about moorings and then walked away.

Shortly thereafter Muise went down to the Cold Duck and asked if defendant had been there. Defendant had not. After procuring a description of defendant and his vehicle, Deputy White, in his Sheriff's Department automobile, and Deputies Kinney and Brawn in a separate car, left the marina to locate defendant. In Georgetown Center White passed defendant heading in the opposite direction. The two had eye contact, and defendant accelerated rapidly. White turned around and gave chase. To catch defendant White traveled at speeds near 90 m. p. h. With his lights and siren operating, White caught up with defendant after 1½ to 2 miles and tailed defendant for another mile at 70 m. p. h. before defendant stopped his vehicle. The road was two lanes, narrow and winding. The speed limit was unposted but was statutorily set at 45 m. p. h. Defendant produced his license and the vehicle registration for White, and in response to a question, defendant told White that he owned the Cold Duck. Defendant agreed to accompany White back to the marina. Brawn and Kinney pulled their car in behind White on the way to the marina.

At the marina parking lot, Brawn began to question defendant. Defendant admitted that he owned the Cold Duck, but refused to state why he had left the marina so abruptly. Brawn then read defendant his *Miranda* rights from White's *Miranda* warning card. Defendant agreed to speak without a lawyer. Sheriff Tainter next

---

**3.** Kinney testified that he had previously been to Mill Isle on May 11, 1977 in an attempt to serve papers on a man and a woman in connection with a check-cashing matter. He was unable to effect service, and the incident bore no relation to the Cold Duck affair.

arrived. Defendant said that ownership papers were on the boat and voluntarily accompanied Brawn and Tainter aboard the Cold Duck. Within a few minutes of their boarding the Cold Duck, shortly before 11:00 a. m., Agent Drinan arrived at the marina, was briefed by Brawn, and also boarded the boat. Drinan identified himself to defendant by telling defendant his name, title, and reason for being at the marina. Drinan said that he had reason to believe that defendant and his boat had been engaged in drug smuggling activity. Drinan observed two burned marihuana cigarettes in an ashtray in the cabin.

While Drinan was talking with defendant aboard the Cold Duck, White and Kinney were in the marina parking lot "admiring" defendant's Blazer. Deputy Sheriff Bruce E. Settler joined the two in the lot, and he too admired the vehicle. Defendant had left open the door on the driver's side of the Blazer. As the three deputies peered in through the door to examine the instrument panel, they observed what they suspected to be marihuana debris on the front floor of the Blazer. Settler saw more debris in the back seat area. Settler gathered debris from both parts of the Blazer, field-tested the substance, and learned that it was marihuana. White then locked the automobile.

White and Settler went to the Cold Duck and informed Drinan of their discovery. Drinan then told defendant he was suspected of marihuana smuggling, and at Drinan's request, Settler again read defendant his Miranda rights. Defendant stated that he understood his rights, that he did not want a lawyer at that time, and that he would be willing to answer questions. The atmosphere at this time was relaxed and casual. Defendant freely moved around the boat and prepared a meal while talking with Drinan. Defendant showed Drinan his bill of sale for the boat (Government Exhibit # 1) and denied that he and his boat had been engaged in any wrongdoing. Drinan explained defendant's probable sentence if he were convicted of drug smuggling. Drinan suggested that defendant could receive a lighter sentence if he cooperated with authorities, but defendant declined to do so. Drinan then told defendant that he, Drinan, was seizing the Cold Duck.[4]

Defendant, Drinan, and the County officers next left the boat and returned to the locked Blazer. Although defendant claimed he did not know who owned the vehicle, he did unlock the door and the trunk of the Blazer with his keys. In the trunk were four suitcases, which Drinan removed and placed on the ground. The first three suitcases were unlocked. With each of the unlocked suitcases, Drinan asked defendant if he owned it. When defendant replied in the negative, Drinan then asked if defendant knew who was the owner. When defendant again answered negatively, Drinan proceeded to search the suitcase, without any objection by defendant. The fourth piece of luggage (Government Exhibit # 2) was locked with a combination lock. Defendant denied ownership of this bag as well, but agreed to work the combination and unlock it. In the fourth suitcase Drinan found a checkbook bearing the name of Jackie D. Miller, which defendant claimed belonged to his father, and a cube of what appeared to be hashish. Drinan field-tested the substance and found it to be hashish. He then seized the hashish, placed defendant under arrest for illegal possession of hashish, and seized the Blazer.[5]

Following the arrest, Settler frisked defendant and found a sales receipt (Government Exhibit # 3) for an industrial vacuum cleaner purchased at Sears, Roebuck & Co. on May 13, 1977. A "John Davis," had signed the receipt as purchaser. Defendant at first denied knowing "John Davis," but

4. Drinan admitted during his testimony that at the time the only basis upon which he could have seized the Cold Duck was the marihuana debris which he and the deputies had observed on board the boat. See United States v. One Clipper Bow Ketch "NISKU," 548 F.2d 8 (1st Cir. 1977).

5. Under cross-examination Drinan conceded that he made it clear to defendant that the suitcases eventually would be opened with or without defendant's assistance.

later admitted that he had signed the receipt. After the arrest the Blazer was thoroughly searched and a key (Government Exhibit # 5), which later proved to fit the lock of the main house at Mill Isle, was found. The party then left the Blazer and returned to the Cold Duck. Pursuant to a request by Drinan, D.E.A. Agent Wayne L. Steadman arrived at the Cold Duck about 2:00 p. m. Steadman told defendant he was under arrest and had defendant read with him a *Miranda* rights form (Government Exhibit # 4). Although defendant refused to sign the form, he stated that he understood his rights. He neither asked for a lawyer nor demanded that all questioning cease. Steadman gave defendant receipts for his boat and car and took defendant's history. Defendant then was transported to a detention cell at the Sagadahoc County Sheriff's Office in Bath.

After defendant was taken to the detention cell, Drinan, Brawn and Settler drove to Woolwich to investigate the post office box address defendant had used. The officers obtained the street address from a postal employee. They found the house was empty and learned from neighbors that the occupant, "Jackie," had moved out several weeks before.

## 2. *The First Mill Isle Visit*

On the way back from Woolwich, around 4:00 p. m., Deputy Brawn suggested that, because of the course line on the chart leading from the marina to Mill Isle, he, Drinan, and Settler should go to Mill Isle to see if any of the residents could add to information about the Cold Duck.[6] Drinan had not seen the chart on the Cold Duck and this was the first time he had heard of Mill Isle.[7] The officers decided to go to

Mill Isle to question the occupants of the houses there to see if they had observed any unusual activity at the deep water dock located there.

Upon arriving at Mill Isle the officers drove toward the chalet to question the occupants. They parked between the chalet and the dock. A telescope protruding from a trash barrel on the dock immediately attracted their attention. As they walked toward and onto the dock they observed substantial amounts of marihuana debris spread over the boards of the dock and in the cracks between the boards. The debris later tested as marihuana. Fresh tire tracks in the road from the dock bore distinctive markings similar to the criss-cross tread of the oversize tires on the Blazer. At the chalet the curtains were drawn and no one responded to the agents' knocks. As the officers prepared to go to the main house, Brawn suggested that they take a shortcut on a woods road leading from the chalet to the main house. On this road before they reached the main house the officers spotted a large tarpaulin, which covered a bulky object located at the side of the road. Scattered around it were baggie twists, of the sort used to tie large trash bags, and marihuana debris. The trail was beaten down and bore tire marks matching those near the dock. Drinan lifted the tarpaulin. Underneath was a burlap bag, weighing 40 lbs., measuring $2' \times 2.5' \times 1'$, with the number "43" stenciled in red on it. Drinan identified the object as a bale of marihuana. The contents later tested to be marihuana. Drinan placed the bale in the trunk of the car, and the agents left Mill Isle and returned to the Sheriff's office in Bath.

---

6. At some time during the morning or early afternoon hours of May 14, marina owner Becker had mentioned to Brawn his suspicions that the Cold Duck may have been associated with alleged drug smuggling activity at Mill Isle, which the D.E.A. had investigated in 1974. He also mentioned that a man named Wayland Purmont had been the subject of the investigation. Brawn testified that he paid little attention to Becker's comment, did nothing about it, and did not mention the conversation to Drinan.

7. *Mill Isle is a peninsula of land connected to the mainland by a causeway. The parcel contains a dock, a chalet cottage near the dock, a main house one-quarter mile from the chalet, a barn close to the main house, and assorted outbuildings. The road across the causeway to the main house is a public road. All other roads on Mill Isle are private.*

At Bath, Drinan showed the bale to defendant in his detention cell, stated that the "stakes" had gone up, and asked defendant if he wished to cooperate. Defendant again declined. Drinan then left the cell and joined Brawn at the Lincoln County Courthouse, where Brawn and an assistant district attorney prepared an affidavit for a search warrant for the premises at Mill Isle (Government Exhibit # 10).[8] Around 8:00 p. m. Judge Paul MacDonald of the Maine District Court issued the warrant (Government Exhibit # 10) to Brawn.

### 3. The Second Mill Isle Visit

By 8:30 p. m. a search party consisting of Drinan, Brawn, Settler and several other deputies and state police officers assembled at Mill Isle. Drinan and Brawn led the search of the main house. Settler and others went to the chalet. They found that the chalet was stacked waist high with over 60 bales of marihuana. Testing later proved the substance to be marihuana. There also were warehouse rollers and stands and a new Sears industrial vacuum cleaner bearing the same model number as that on the receipt which defendant had had on his person. News of this find was conveyed to Drinan in the main house. Drinan telephoned defendant at the Bath Police Department jail, to which he had been moved, disclosed what the authorities had found, and again asked defendant if he wished to cooperate. Defendant again refused. Completing the inventory and related matters of the search lasted until 12:30 a.m., May 15. Brawn executed the return on the warrant (Government Exhibit # 10) and filed it with the Clerk of the Maine District Court in Bath.

### C. Events of Sunday, May 15, 1977

Drinan returned to defendant's cell at about 1:00 a. m. on Sunday, May 15. With Drinan and defendant in one car and Steadman following behind in a second vehicle, the party left Bath to transfer defendant to the Cumberland County jail in Portland pending his arraignment before the U.S. Magistrate. During the ride Drinan and defendant engaged in small talk. They and Steadman stopped for a snack at a diner before reaching Portland. Defendant had a tuna fish sandwich and a cup of hot chocolate. Shortly after they left the diner, defendant spontaneously asked Drinan where he had found the first bale. Drinan refused to answer, but remarked that defendant had made a big mistake in jeopardizing a million dollar deal by returning for a $20,000 boat. Drinan next said that he did not think that law enforcement personnel had recovered all of the marihuana. Defendant replied, "Exactly. But you got a good piece of it, enough to destroy our profit." There was a pause, and defendant then stated, "Funny thing was, this was our first run." Drinan expressed disbelief at this statement and inquired as to the source of the marihuana. Defendant said it was of good quality from Colombia. At about 1:30 a.m. defendant was checked into the Cumberland County jail.

### D. Events of Monday, May 16, 1977

On Monday, May 16, defendant was arraigned, with his present counsel, before the United States Magistrate in Portland. This date was the first time that defendant sought the assistance of counsel. The arraignment proceedings were postponed until the afternoon in order to give defendant the opportunity to obtain counsel.

## II

### The Law

Defendant seeks to suppress all of the evidence taken from the Cold Duck, the Blazer, the suitcase, his person and Mill Isle prior to the issuance of the search warrant on the ground that such evidence was the product of warrantless searches and seizures which were not justified by a recog-

---

**8.** Brawn attached to the affidavit two photographs of Mill Isle (Government Exhibits # 6 and # 7) taken in conjunction with the 1974 Purmont investigation, which he had found in a file in his desk. The previous occupant of Brawn's desk at the Sheriff's office had left the file, and Brawn had not bothered to remove it.

nized exception to the Fourth Amendment warrant requirement. Defendant further argues that the evidence seized at Mill Isle pursuant to the search warrant must be suppressed because Brawn's affidavit failed to set forth sufficient probable cause to sustain its issuance, because the warrant was overbroad on its face, and because the warrant failed to comply with the terms of Fed.R.Crim.P. 41. Finally, defendant contends that his statements to Drinan in the early hours of Sunday, May 15, during their drive from Bath to Portland are inadmissible under the doctrine of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and its progeny.

The evidence at issue on this motion may be classified as follows: (a) the marihuana debris, nautical chart, and bill of sale taken from the yacht Cold Duck, (b) the marihuana debris and the key taken from the Blazer, (c) the suitcase secured by a combination lock and the hashish found therein, (d) the receipt for the industrial vacuum cleaner found on defendant's person, (e) the bale of marihuana, the tarpaulin, the baggie twists, and the marihuana debris discovered at Mill Isle during the afternoon of Saturday, May 14, prior to the issuance of the search warrant, (f) the numerous bales of marihuana, the warehouse rollers and stands, the industrial vacuum cleaner, and the various other items seized at Mill Isle during the evening of Saturday, May 14, after the issuance of the search warrant, and (g) defendant's statements to Drinan in the early morning of Sunday, May 15. The Court will consider each category of evidence seriatim.

### A. *Items Taken From the Yacht Cold Duck*

■ At the outset, the Court reiterates the fundamental tenets of the law of search and seizure, that warrantless searches or seizures are impermissible unless justified by recognized exigent circumstances and that the burden rests on the Government to prove that such circumstances had existed when it attempts to validate a warrantless search or seizure. *E. g., Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

■ It is settled that an intrusion by law enforcement officials during the course of an emergency situation qualifies as an exigent circumstance for which a warrant is not required. *E. g., United States v. Jeffers*, 342 U.S. 48, 52, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *McDonald v. United States*, 335 U.S. 451, 454, 69 S.Ct. 191, 93 L.Ed. 153 (1948). That such an emergency existed on Friday, May 13, when Brawn and Coast Guard officers first boarded the Cold Duck is beyond dispute.[9] A yacht unknown to personnel at the Robinhood Marina and with no one aboard was discovered fouled in one of the marina's moorings. It was entirely reasonable for law enforcement officials to fear that a drowning or other nautical mishap may have occurred, and it was equally reasonable for them to board the boat in order to investigate the purported accident. That Kinney and White were lawfully investigating the same emergency when they boarded the Cold Duck on the morning of May 14 and observed the marihuana debris and the navigational chart is clearly established by uncontradicted testimony.[10] The evidence is also uncontroverted that the two did not engage in a general search of the vessel. The officers were lawfully aboard the vessel, and the items they observed were in plain view and discovered inadvertently. On these facts, the seizure of the debris and the chart fall

---

**9.** Indeed, defendant so concedes in his Reply Memorandum in Support of his Motion For Return of Property and for Suppression of Evidence, at 2.

**10.** Defendant attempts to make much of Kinney's official designation as the deputy in charge of criminal investigation. Defendant claims that Kinney's presence at the marina transformed the investigation of the accident into a narcotics probe. As Kinney himself testified, however, due to the small size of the Sagadahoc County Sheriff's Department, he frequently was called upon to investigate a range of matters, both criminal and noncriminal. On the morning of May 14 Kinney was investigating a possible drowning.

within the "plain view" exception to the warrant requirement, the criteria for which were set forth by the Supreme Court in *Coolidge v. New Hampshire, supra* 403 U.S. at 464–73, 91 S.Ct. 2022. Defendant's motion to suppress these items is denied.

The bill of sale for the Cold Duck likewise is admissible. Defendant voluntarily accompanied Taintor and Brawn aboard the boat, willingly furnished the bill of sale for Drinan's perusal, and had been read his *Miranda* rights twice prior to producing the bill of sale. Defendant suggests, however, that he may have acted under duress. Whether his action was in fact voluntary or was the product of duress or coercion is "a question of fact to be determined from the totality of all the circumstances," including the maturity of the accused, his educational background and intelligence, whether the accused was informed of his constitutional rights, the length of the accused's detention, and whether he was subject to physical punishment or other forms of coercion which overbore his will. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

No evidence was introduced that defendant was under duress when he produced the bill of sale. To the contrary, the atmosphere aboard the Cold Duck during the episode was relaxed and casual. Defendant is a mature, 25 year old high school graduate who had been fully informed of his rights prior to the seizure of the bill of sale. The undisputed evidence establishes that his actions were completely voluntary. Under well settled principles, the bill of sale is clearly admissible. *Schneckloth, supra* at 219, 93 S.Ct. 2041; *Davis v. United States*, 328 U.S. 582, 593–94, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); *Zap v. United States*, 328 U.S. 624, 630, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946). Defendant's motion to suppress the bill of sale is denied.

## B. *Items Taken From the Blazer*

The two items found in the Blazer, the marihuana debris and the key, were taken without warrant but at different times and under different circumstances.

The marihuana debris was found in the vehicle after defendant had returned to the marina parking lot with White but before Drinan placed defendant under arrest. Defendant had left open the door on the driver's side of the Blazer when he boarded the Cold Duck with Tainter and Brawn. While "admiring" the vehicle, White, Kinney and Settler spotted the debris on the front floor through the open door. The discovery of the debris was inadvertent and not the result of a search of the car. *See Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992; 19 L.Ed.2d 1067 (1968). No privacy expectation of the defendant was violated when the three deputies saw the debris through the open door and removed a sample from the Blazer. As the Supreme Court consistently has noted, an individual has a lesser expectation of privacy with respect to a motor vehicle than he enjoys with regard to his person, his home, or repositories of his personal effects. *E. g., United States. v. Chadwick*, 433 U.S. 1, 3, 97 S.Ct. 2476, 53 L.Ed.2d 538 (June 21, 1977); *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Defendant further lessened this diminished privacy expectation by leaving the vehicle unlocked and the door open. The debris was in plain view to anyone standing in the parking lot near the open door. The deputies' presence in the parking lot was permissible, and the officers' discovery of the marihuana debris was inadvertent. The debris is admissible under the plain view doctrine. *Coolidge v. New Hampshire, supra* 403 U.S. at 464–73, 91 S.Ct. 2022; *Harris v. United States, supra*.

The key to the lock of the main house at Mill Isle was found in the Blazer after Drinan had arrested defendant for illegal possession of hashish and after he had seized the vehicle. The search of the vehicle was clearly proper as incident to the arrest. *Gorman v. United States*, 380 F.2d 158, 162 (1st Cir. 1967), and cases there

cited. *See also Chambers v. Maroney, supra* 399 U.S. at 46–52, 90 S.Ct. 1975. Moreover, as a D.E.A. agent, Drinan possessed statutory authority to take the Blazer into custody without a warrant because of its use in the transportation of controlled substances—the marihuana debris and the hashish which had been found therein. 21 U.S.C. §§ 878(4), 881(b)(1), (4); *United States v. One 1972 Chevrolet Nova*, 560 F.2d 464 (1st Cir. 1977). It has been consistently held that warrantless searches of vehicles appropriately taken into custody are reasonable under the Fourth Amendment. *South Dakota v. Opperman*, 428 U.S. 364, 367–76, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Cooper v. California*, 386 U.S. 58, 61–62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). On either basis, the key is admissible in evidence.

Defendant's motion to suppress the marihuana debris and the key found in the Blazer is denied.

### C. Combination-lock Suitcase and Hashish Therein

The admissibility of the locked suitcase and the hashish discovered therein pivots on whether defendant validly consented to Drinan's removal of the suitcase from the Blazer and his search of the contents. A locked piece of personal luggage carries with it a high expectation of privacy, and a warrantless intrusion into such a repository of personal effects must be justified by consent or some similar circumstance. *United States v. Chadwick, supra*, 433 U.S. at 11, 97 S.Ct. 2476.

The Court is satisfied that under the tests propounded in *Schneckloth v. Bustamonte, supra*, defendant's behavior in permitting Drinan to remove and examine the suitcase was wholly voluntary. Defendant willingly unlocked the Blazer in which the suitcase had been stored and worked the combination lock of the bag himself. He did so after twice being apprised of his *Miranda* rights. The fact that Drinan indicated to defendant that law enforcement officials eventually would open the suitcase with or without defendant's consent cannot be viewed as interfering with defendant's free will in any way. Both before and after this incident, defendant demonstrated his capacity to exercise independent judgment through his decisions not to answer various questions and not to comply with certain requests of law enforcement officials. The suitcase and the hashish are properly admissible as the product of a valid consent search. *United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Schneckloth v. Bustamonte, supra; Davis v. United States, supra; Zap v. United States, supra; Gorman v. United States, supra* at 163–64, 165. Defendant's motion to suppress the suitcase and hashish is denied.

### D. Receipt Taken From Defendant's Person

The search of defendant's person and the seizure of the receipt for the industrial vacuum cleaner found on his person are justified as incident to a lawful arrest. Drinan's arrest of defendant after discovery of the hashish plainly was legal. Drinan had sufficient probable cause to arrest defendant for illegal possession of hashish, and he obtained the evidence upon which probable cause was based through a valid consent search. The Supreme Court has thoroughly established the authority of law enforcement officers to search a person incident to a lawful arrest. *E. g., United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Defendant's motion to suppress the receipt is denied.

### E. Items Taken From Mill Isle Prior to the Issuance of the Search Warrant

The legality of the taking of the marihuana debris, the tarpaulin, the baggie twists, and the marihuana bale from Mill Isle prior to the issuance of the search warrant raises two questions. The first is whether Drinan, Brawn and Settler appropriately visited Mill Isle without a warrant and the second is, if so, whether the items they found were discovered as the result of an unlawful search and seizure.

The evidence presented at the hearing consistently demonstrates that the three officers first went to Mill Isle in order to question residents there about the Cold Duck. None of the testimony suggests that the officers intended to conduct a search of the premises or were operating under any other improper motive. It is firmly established that a police officer who in the performance of his duty enters upon private property to ask preliminary questions of the occupants thereof does not commit an illegal search. E. g., United States v. Hersh, 464 F.2d 228, 229–30 (9th Cir. 1972); United States v. Knight, 451 F.2d 275, 278 (5th Cir. 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972); Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964). Thus, the initial entry onto the Mill Isle peninsula was for legitimate purposes and did not constitute an illegal search.

Since the presence of the three officers at Mill Isle was legal, the objects which they found are admissible provided that the "plain view" standards of Coolidge v. New Hampshire, supra, are met. There is no question that the marihuana debris scattered between the boards on the dock falls within the ambit of the plain view doctrine. Drinan, Brawn and Settler had just parked their vehicle between the chalet cottage and the dock when the telescope in the trash barrel reasonably drew their attention to the dock. Their discovery of the marihuana debris, in plain view on the dock, was completely accidental and unplanned.

The discovery of the marihuana debris, the baggie twists, the tarpaulin and the marihuana bale on the unpaved road running between the chalet and the main dwelling was similarly inadvertent. With the exception of the bale itself, all of these latter items were in plain view. As for the marihuana bale, the Supreme Court has consistently interpreted Fourth Amendment questions in the context of privacy-oriented standards. E. g., United States v. Chadwick, supra 433 U.S. at 11, 97 S.Ct. 2476; Katz v. United States, 389 U.S. 347, 351–53, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

Applying these standards, the Court is persuaded that defendant suffered no invasion of privacy when Drinan lifted the tarpaulin off the bale. Unlike the double-locked footlocker involved in United States v. Chadwick, supra, a tarpaulin is not a repository of personal effects enjoying a high degree of protection against intrusion. Nor was the bale of marihuana found in a place, such as a private dwelling, usually free from intrusion by individuals other than the owner of the property. It was discovered lying by a woods road open for use by anyone passing from the dock to the main house.[11] Moreover, the bale was not secured from intrusion in any meaningful way. It was not locked in a trunk or stamped with labels warning unauthorized people to keep away but merely was draped with a tarpaulin. Clearly, the condition and location of the bale was such that defendant could not have had a justifiable expectation of privacy with respect to its discovery by persons lawfully passing along the woods road. Cf. United States v. Hanahan, 442 F.2d 649 (7th Cir. 1971).

The marihuana bale, as well as the tarpaulin, the baggie twists, and the marihuana debris found by the officers at Mill Isle on the afternoon of May 14 were reasonably seized and are admissible in evidence. Defendant's motion to suppress these items is denied.

F. Items Taken From Mill Isle Pursuant to the Warrant

Defendant's objections to the admissibility of the items taken from Mill Isle during the evening of May 14 pursuant to the search warrant are threefold. None have merit.

▬▬▬ (1) Defendant initially argues that the affidavit underlying the search warrant failed to set forth sufficient probable cause to sustain the issuance of a warrant authorizing a search of the buildings at Mill Isle. Specifically, defendant contends that Brawn's affidavit does not allege facts to link the marihuana bale found by the

---

11. There is no evidence that "No Trespassing" signs were posted on the premises at Mill Isle.

road with any of the buildings on the premises.

The courts have consistently compared the level of probable cause necessary to support a warrant with a reasonable belief standard and have not equated the existence of probable cause with proof beyond a reasonable doubt. *E. g., Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Vitali v. United States,* 383 F.2d 121, 122 (1st Cir. 1967); *Rosencranz v. United States,* 356 F.2d 310, 314 (1st Cir. 1966) (probable cause only means evidence sufficient "to persuade a man of reasonable caution to believe a crime is being committed"). Furthermore, the magistrate reviewing the application for the warrant "is entitled to draw reasonable inferences from the facts contained in the affidavit based on his experience in such matters." *Rosencranz v. United States, supra; United States v. Spearman,* 532 F.2d 132, 133 (9th Cir. 1976).

Based on the facts alleged in the affidavit, on the photographs appended to the affidavit showing the relationship of the road where the marihuana bale was found to the two dwellings, and on the reasonable inference which the magistrate was entitled to draw that a smuggler would attempt both to protect contraband from the elements and to hide it from police authorities by placing it in a building, the affidavit clearly sets forth adequate probable cause to authorize issuance of the warrant to search the main house, the chalet, the barn and the outbuildings at Mill Isle. As the Supreme Court stated in *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13, L.Ed.2d 684 (1965):

> If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings

have no proper place in this area. A grudging or negative attitude by reviewing courts towards warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

■■■ (2) Defendant also contends that the warrant was invalid because it was overbroad on its face. Defendant relies principally on *United States v. Votteller,* 544 F.2d 1355 (6th Cir. 1976), for the proposition that the warrant was too broad since it did not "*particularly* describe" the buildings at Mill Isle to be searched and the probable cause for searching each structure. The *Votteller* opinion, however, is inapposite and clearly distinguishable on its facts from the present case. The defective warrant in *Votteller* pertained to a multi-use, three-story building with apartments in the basement and on the second and third floors. The affidavit linked possible criminal activity only to the bar on the first floor. The Court held the warrant invalid for failure to particularize the place to be searched.

The question of sufficient particularity turns on whether the objects or buildings to be searched are described with the degree of clarity necessary so that the investigating officer will not search buildings, objects, persons or dwellings other than those for which probable cause sustaining the search exists and other than those which the magistrate contemplated when he issued the warrant. The purpose of the particularity requirement is to curb a general search unsupported by probable cause. *E. g., Berger v. New York,* 388 U.S. 41, 55–60, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *Stanford v. Texas,* 379 U.S. 476, 480–86, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). In the instant case, the warrant authorized a search of the buildings on Mill Isle as described in Brawn's affidavit: the main dwelling, the barn, the chalet and several small outbuildings. Because of the geographical isolation of Mill Isle, the common knowledge that it was a single parcel of real estate, the proximity of the buildings to be searched, the spatial relationship of the marihuana bale

and the debris found during the first visit to those buildings, and the description of the buildings contained in Brawn's affidavit and shown in the accompanying photographs, it cannot be doubted that the warrant described with sufficient precision the objects of the search. *Cf. Houser v. Geary*, 465 F.2d 193, 196 (9th Cir. 1972), *cert. denied*, 409 U.S. 1113, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973); *United States v. Hassell*, 427 F.2d 348, 349 (6th Cir. 1970).[12]

■■■ (3) Defendant's final challenge to the warrant stems from the dual State-federal nature of the investigation. The warrant was issued as a State warrant by a State court judge to a State law enforcement officer on State grounds and was returned by a State officer to a State court, all in accordance with State rules. *See* Me.R.Crim.P. 41. It is undisputed, however, that the warrant aided a federal investigation, that federal law enforcement officers actively participated both in obtaining the warrant and in its execution, that no State prosecution has resulted, and that the evidence seized pursuant to the warrant is being employed in a federal prosecution. The search was therefore a "federal search," *see Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927), and the Court will assume for purposes of the present decision that, as defendant contends, the warrant was governed by the federal standards embodied in Fed.R.Crim.P. 41. *See United States v. Burke*, 517 F.2d 377, 381–87 (2d Cir. 1975); *United States v. Sellers*, 483 F.2d 37, 41–44 (5th Cir. 1973), *cert. denied*, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974); *United States v. Haywood*, 150 U.S. App.D.C. 247, 251, 464 F.2d 756, 760 (1972); *Navarro v. United States (I)*, 400 F.2d 315 (5th Cir. 1968).

■■■ Defendant correctly notes that the search warrant did not comply with the requirements of Rule 41(c) in three respects: 1) the warrant was not addressed to a federal officer; 2) the warrant did not specify the time (not to exceed ten days) within which the search was to be completed; 3) the warrant failed to require that it be returned to a federal magistrate. Defendant argues that the failure of the warrant to comply with the requirements of Rule 41(c) in these respects renders inadmissible the evidence seized pursuant to the warrant.[13] Defendant does not contend, however, that the violations of Rule 41(c) are of constitutional magnitude, and when a warrant in a joint State-federal search has been issued under valid authority,[14] the courts have refused to exclude evidence

---

**12.** Defendant appears also to contend that the warrant was defective because it failed to specify the exact quantity of marihuana to be sought. This argument borders on the frivolous. As the court stated in *United States v. Scharfman*, 448 F.2d 1352, 1354 (2d Cir. 1971), "The Fourth Amendment requirements do not impose a burden on the executing officer 'beyond his power to meet'." A requirement that the exact amount of contraband being sought be specified in a warrant would impose an impossible burden on the officers. Such a result is clearly not contemplated by the Fourth Amendment. *See United States v. Scharfman, supra; United States v. Fuller*, 441 F.2d 755 (4th Cir.), *cert. denied*, 404 U.S. 830, 92 S.Ct. 73, 30 L.Ed.2d 59 (1971).

**13.** Defendant also argues that the evidence obtained under the warrant cannot be used in a federal prosecution because the affidavit did not allege probable cause to believe that a *federal* crime had been committed. This argument was specifically rejected by the court in *United States v. Sellers, supra*, which empha-

sized that federal and State officers acting jointly "should be free to make a considered choice based on the best available information and unencumbered by merely technical procedural rules." *Id.* at 44.

**14.** Defendant cites *Navarro v. United States (I), supra*, and *United States v. Haywood, supra*, for the proposition that violation of Rule 41 triggers the exclusionary rule. *Navarro* held that the failure of law enforcement officers to obtain a warrant from "a judge of a state court of record," as required by Rule 41(a), required exclusion of the evidence obtained pursuant to the warrant. *See also United States v. Haywood, supra* (dictum). As Judge Friendly observed in *Burke*, however, "the defect [in *Navarro*] was basic; since the issuing judge was not of 'a state court of record', there was in effect no warrant at all for federal purposes." *Id.* at 385. In the present case, it is uncontroverted that the warrant was issued by a judge of a court of record of the State of Maine.

obtained under the warrant, despite technical noncompliance with Rule 41(c). *United States v. Burke, supra; United States v. Sellers, supra.*

The argument here made by defendant was raised and rejected by the court in *United States v. Burke, supra. Burke* involved a State warrant issued by a State court judge in aid of a federal investigation. The warrant failed to conform to the requirements of Rule 41(c) in precisely the same three respects as the warrant in the instant case. Although the court found that the three provisions which had been violated reflected "a 'Rule-embodied policy designed to protect the integrity of the federal courts *or to govern the conduct of federal officers* ' " (emphasis in original), *id.* at 385, the court held that the defects in the warrant were not of sufficient consequence to justify exclusion of the evidence. The court noted that, despite the technical defects in the warrant, a federal officer in fact assisted in its execution, the search was made on the same day as the warrant was issued, and the return was made on the following day to the issuing court by the State officer. Judge Friendly, writing for the court, concluded that, except in a case like *Navarro*, where the violation was found to be of constitutional dimensions, "violations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Id.* at 386–87 (footnotes omitted). *See also United States v. Sellers, supra.*

The facts in the instant case precisely parallel those of *Burke.* The Rule 41 violations are plainly not of constitutional magnitude, and this Court agrees with *Burke* that they were not of sufficient consequence to justify the use of the exclusionary rule. Defendant has introduced no evidence to suggest that the failure to comply with the requirements of Rule 41(c) prejudiced him in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed.

Nor is there any evidence of an intentional and deliberate disregard of a provision in the Rule. The Court concludes that the warrant was valid despite the technical violations of Rule 41(c).

Defendant's motion to suppress the bales of marihuana, the warehouse rollers and stands, the industrial vacuum cleaner and the other evidence seized at Mill Isle during the evening of Saturday, May 14, pursuant to the search warrant is denied.

### G. Defendant's Statements to Drinan on Sunday, May 15

The admissibility of defendant's inculpatory statements to Drinan in the early morning hours of Sunday, May 15, during the trip from Bath to Portland, depends wholly on the voluntariness of defendant's waiver of his right to remain silent. *Miranda v. Arizona, supra* 384 U.S. at 444–45, 86 S.Ct. 1602. At no time during the events of Saturday, May 14, or in the course of the ride from Bath to Portland early the next morning did defendant ask that he be allowed to consult with counsel or request that all interrogation of him cease. The evidence produced at the hearing revealed that defendant willingly made the statements to Drinan and that he had not been subject to coercion or duress of any sort. Law enforcement officials treated defendant in an exemplary manner throughout. Defendant had not been threatened or physically abused. He was not suffering from prolonged lack of sleep when he spoke with Drinan, and he had eaten a light meal which Steadman had bought him just prior to talking to Drinan. Tellingly, it was defendant, not Drinan, who initiated the conversation.

Prior to defendant's departing Bath with Drinan, law enforcement officers on three separate occasions had informed defendant of his *Miranda* rights. Neither the fact that defendant was last read his rights several hours prior to the drive to Portland nor the fact that defendant refused to sign a written waiver of his rights taint the voluntariness of defendant's waiver. *United*

States v. Rogers, 504 F.2d 1079 (5th Cir. 1974); United States v. Osterburg, 423 F.2d 704, 705 (9th Cir.), cert. denied, 399 U.S. 914, 90 S.Ct. 2166, 26 L.Ed.2d 571 (1970); United States v. Speaks, 453 F.2d 966, 968– 69 (1st Cir.), cert. denied, 405 U.S. 1071, 92 S.Ct. 1522, 31 L.Ed.2d 804 (1972); United States v. Van Dusen, 431 F.2d 1278 (1st Cir. 1970). Defendant's waiver of his right to remain silent was a knowing, intelligent and voluntary decision. The statements he made to Drinan are admissible. Defendant's motion to suppress the statements is denied.

\* \* \*

Defendant's motion for return of property and for suppression of evidence is in all respects denied.

IT IS SO ORDERED.